1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11  ANDRES R. ESPINOZA ZAVALA,              )  Case No.: 1:17-cv-0527 - JLT
                                            )
12              Plaintiff,                  )  **ORDER REMANDING THE ACTION PURSUANT**
                                            )  **TO SENTENCE FOUR OF 42 U.S.C. § 405(g)**
13        v.                                )
                                            )  **ORDER DIRECTING ENTRY OF JUDGMENT IN**
14  NANCY A. BERRYHILL,                     )  **FAVOR OF PLAINTIFF ANDRES R. ESPINOZA**
    Acting Commissioner of Social Security, )  **ZAVALA AND AGAINST DEFENDANT NANCY**
15                                          )  **A. BERRYHILL, ACTING COMMISSIONER OF**
                                            )  **SOCIAL SECURITY**
16              Defendant.                  )
                                            )
17  _____)

18        Andres R. Espinoza Zavala asserts he is entitled to a period of disability and disability

19  insurance benefits under Title II of the Social Security Act.  Plaintiff argues the administrative law

20  judge erred in evaluating the medical evidence.  Because the ALJ failed to identify specific and

21  legitimate reasons rejecting the opinions of Plaintiff's treating physician, the decision is **REMANDED**

22  for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

23                    **PROCEDURAL HISTORY**

24        In May 2012, Plaintiff filed file an application for benefits, alleging disability beginning on

25  April 17, 2009.  (Doc18-3 at 5)  The Social Security Administration denied the applications at the

26  initial level and upon reconsideration.  (*See* Doc. 9-5 at 5-19; Doc. 18-3 at 5)  After requesting a

27  hearing, Plaintiff testified before an ALJ on August 27, 2015.  (Doc. 9-3 at 30; Doc. 18-3 at 5) The

28  ALJ concluded Plaintiff was not disabled and issued an order denying benefits on October 28, 2015.

                                            1

(*Id.* at 21-30)  When the Appeals Council denied Plaintiff's request for review on February 7, 2017 (Doc. 9-3 at 2-4), the ALJ's findings became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant can engage in other substantial gainful

employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. § 404.1520(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial evidence and objective medical evidence. 20 C.F.R. § 404.1527.

## A. Relevant Medical Background and Evidence

On April 17, 2009, Plaintiff was working as a security guard at a corner market when he "was shot point blank" in the abdomen and "hit in the head with a pistol during a robbery." (Doc. 9-8 at 2; Doc. 9-9 at 43) Plaintiff stated four men came to the store and he tried to push away an assailant when he was shot. (Doc. 9-10 at 12) The gunshot wounded Plaintiff's large and small bowels, and "shattered [the] lateral aspect of the right iliac bone with [the] bullet retained in the right hip." (Doc. 9-9 at 43) Plaintiff was also diagnosed with "mild cardiomegaly" upon admission, and had atrial fibrillation. (*Id.* at 43-44) Due to the "multiple small bowel injuries," Plaintiff underwent "[a] right colectomy and small bowel resection." (*Id.* at 44, 65) Five days later, Plaintiff was transferred to a Kaiser Permanente facility upon the request of his insurance. (*Id.* at 38, 43) He was discharged from the Kaiser hospital on April 28, 2009. (Doc. 9-11 at 49)

At a follow-up appointment the following month, Plaintiff reported that he was "overall doing better." (Doc. 9-12 at 20) He stated that his pain was "better with norco, but request[ed] a medication to sleep." (*Id.*) Plaintiff was prescribed Zolpidem for insomnia and hydrocodone "for post abdominal surgery and healing wounds." (*See id.* at 27-28)

On July 6, 2009, Dr. Jorge Barragan performed an initial psychological assessment, which included a clinical examination, mental status examination, Beck Depression Inventory II (BDI-II), and a review of Plaintiff's medical file. (Doc. 9-12 at 42) Plaintiff told Dr. Barragan that he felt "very

restless and depressed;" he was unable to sleep because he had "nightmares and flashbacks about the incident;" and he avoided "activities, places, conversations, and people associated with the traumatic event." (*Id.* at 43)  Plaintiff also said he had "problems concentrating and [had] become increasingly irritable." (*Id.*)  Dr. Barragan observed that Plaintiff "was extremely nervous and fidgety" and "[h]is concentration and attention span appeared to be somewhat limited." (*Id.* at 43-44)  Dr. Barragan determined Plaintiff's score on the BDI-II indicated "[m]ild depressive symptoms," which included "sad affect, feeling pessimistic about his future, feeling he [was] a total failure, crying more than usual, experiencing fatigue, reduced appetite, reduced concentration ability, [and] reduced libidinal drive." (*Id.* at 44, internal quotation marks omitted)  In addition, Dr. Barragan opined Plaintiff was "experiencing severe anxiety." (*Id.*)  He diagnosed Plaintiff with Posttraumatic Stress Disorder and Depressive Disorder NOS.  (*Id.*)  Dr. Barragan gave Plaintiff a GAF score of 47[1], and recommended he receive individual psychotherapy and have an assessment for psychotropic medication." (*Id.* at 44-45)

In November 2009, Dr. Barragan noted Plaintiff had participated in seven individual therapy sessions between July and November.  (Doc. 9-12 at 56)  Dr. Barragan opined Plaintiff had "benefitted greatly from this course of psychotherapy," stating:

> He is more energetic, assertive, and confident.  He smiles more often, verbalizes more positive self-statement, participates in more pleasurable activities, and has established new social contacts. He also reports that his nightmares, flashbacks, hypervigilance, and physiological reactivity to cues associated with his trauma have decreased.

(*Id.*)  However, Dr. Barragan opined that "[r]egardless of his progress, Mr. Espinoza's PTSD symptoms continue[d] to be debilitating." (*Id.* at 57)  Dr. Barragan explained, "The severity of his symptoms [was] made evidence by his most recent score (56) on the PTSD Checklist." (*Id.*)

The following month, Plaintiff told Dr. Joerg Schuller that Lexapro was "working well" and his nightmares were improving.  (Doc. 9-12 at 59, 72)  His prescription for Lexapro was increased.  (*Id.*)

Dr. Barragan provided completed a psychological treatment update in January 2010, after Plaintiff participated in four more therapy sessions.  (Doc. 9-12 at 69)  Dr. Barragan opined Plaintiff

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV).  A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.* at 34.

"responded significantly well," and reported Plaintiff described "feeling calmer and more content;" "participating in more pleasurable and social activities," such as church as ESL classes; and exercising regularly. (*Id.*) In addition, Plaintiff said he was "no longer experiencing intrusive images about his traumatic injury." (*Id.*) Despite believing Plaintiff's "psychological state [had] improved," Dr. Barragan noted Plaintiff continued to have "debilitating affective symptoms, including disturbing dreams associated with the traumatic event, intense distress when exposed to internal or external cues that symbolize the robbery, exaggerated startle response, irritability, lack of concentration, a sense that 'something horrible is going to happen,' etc." (*Id.*)

In February 2010, Plaintiff reported that he "fell out of bed [while] having a nightmare," which caused "a left chest wall laceration." (Doc. 9-12 at 68) The following month, Dr. Schuller noted Plaintiff continued to be fearful and apprehensive, and have nightmares three to four times each week. (*Id.* at 76) Dr. Schuller added Zoloft to Plaintiff's treatment plan. (*Id.*) At a checkup with Dr. Schuller in April 2010, Plaintiff reported his anxiety had decreased. (*Id.* at 78) Due to continued difficulty falling asleep, Dr. Schuller directed Plaintiff to take Ambien and Senna. (*Id.* at 86)

Dr. Barragan observed that Plaintiff "had responded favorably to psychological intervention, but his affective functioning declined" in July 2010. (Doc. 9-12 at 90) Dr. Barragan noted Plaintiff "attributed [the] emotional decompensation" to the fact that the detective in charge of the case told Plaintiff "they had not arrested the individuals who shot [him]." (*Id.*) Dr. Barragan observed, "the information about his assailants seems to have intensified his PTSD symptoms." (*Id.*) According to Dr. Barragan, Plaintiff's score on the PTSD Checklist increased to 60, and he appeared "fidgety [and] distracted," with "pressured speech." (*Id.* at 91)

In August 2010, Dr. Schuller noted Plaintiff said he was "unable to sleep without" taking Vicodin at night for abdominal cramping. (Doc. 9-13 at 8) He opined Plaintiff continued to suffer from PTSD and insomnia. (*Id.*) Although Dr. Schuller requested that Plaintiff be permitted to continue with Vicodin, the request was denied. (*Id.* at 11, 13)

In February 2011, Dr. Barragan requested authorization to continue psychotherapy sessions, indicating that Plaintiff "regressed psychologically after being told that the paralegal assisting him was shot and killed." (Doc. 9-16 at 62) Dr. Barragan again administered the BDI-II and PTSD

Checklist, and opined his scores "depict[ed] the magnitude of his affective deterioration." (*Id.*) For example, Dr. Barragan noted that Plaintiff's score on the BDI-II of 21 fell "within the 'Moderate' range of depressive symptoms." (*Id.* at 62-63) At the beginning of March, Dr. Schuller also noted Plaintiff's symptoms had increased and requested authorization for Dr. Barragan to continue treatment. (Doc. 9-3 at 34-35) The request for additional therapy sessions was approved on March 7, 2011. (*Id.* at 39)

In April and May 2011, Plaintiff told Dr. Schuller that he would "attend adult school for English" and was exercising regularly. (Doc. 9-13 at 44) Although he continued to have nightmares, he stated they decreased to twice a week and he also had decreased hypervigilance. (*Id.* at 45) Plaintiff also told Dr. Schuller that he was "[n]ot afraid to be alone." (*Id.*)

Dr. Barragan completed a psychological treatment update on September 29, 2011. (Doc. 9-13 at 52) He noted Plaintiff had nine sessions between March and September 2011, and opined Plaintiff's "emotional state … fluctuated in the[] past months." (*Id.* at 52-53) Dr. Barragan observed:

> Subsequent to my February 8, 2011 Update Report, Mr. Espinoza was attending school, exercising regularly, sleeping better, having fewer nightmares, and feeling less anxious and depressed. He was also reporting having less pain and expressing more realistic statements about self, others, and the future.
>
> Unfortunately, his affective state declined after our June 29, 2011 meeting. In the following session, he was anxious, restless, and crying. When asked what had triggered his recent emotional deterioration, he noted having family problems due to his inability to be with his family in Mexico. His July 21, 2011 total scores on the BDI-II (32) and PCLC (64) corroborated my observations and his affirmations. He noted feeling depressed, unworthy, anxious, irritable, socially withdrawn, fatigued, and indecisive. He also mentioned having nightmares, disturbing thoughts about his accident, concentration problems, suicidal ideal, and other affective symptoms indicative of depression and PTSD.

(*Id.*) Dr. Barragan opined Plaintiff's symptoms were again improving in September 2011, but believed Plaintiff continued to need psychotherapy. (*Id.*)

In December 2011, Dr. Barragan opined Plaintiff's "emotional wellbeing [had] improved" over the course of the past several months. (Doc. 9-3 at 66-67) He noted, "Once again, he started going to school, church, and the gym. Not only that, he is visiting his sister more often, taking better care of his appearance, and verbalizing increased hope." (*Id.* at 67) Despite these improvements, Dr. Barragan believed Plaintiff "continue[d] to experience PTSD, depression, and chronic pain." (*Id.*)

On February 23, 2012, Dr. Barragan opined Plaintiff continued to meet the "diagnostic criteria for Posttraumatic Stress Disorder… and Depressive Disorder NOS." (Doc. 9-8 at 3) Dr. Barragan noted Plaintiff reported his depression decreased "from an eight to a five" and his anxiety decreased "from an eight to a four." (*Id.*) In addition, Dr. Barragan observed Plaintiff's "ability to confront stimuli associated with his injury [had] increased;" Plaintiff was "able to recall the traumatic incident without becoming as emotionally overwhelmed;" he was more independent; and "on a regular basis," Plaintiff attended school and participated in church activities. (*Id.*) Despite these improvements, Dr. Barragan believed Plaintiff's "affective state remain[ed] stable." (*Id.*) He explained:

> Although his symptoms have attenuated, Mr. Espinoza continues to experience anxiety (i.e. hypervigilance, irritability, sleep disturbance, concentration difficulties, intrusive thoughts about the injury, nightmares, etc.) depression (i.e., depressed mood, fatigue, anhedonia, low self-worth, pessimism, etc.) and chronic pain (left leg, buttocks, and abdominal area.

(*Id.*) Because Plaintiff's "physical and emotional symptoms continue[d] to interfere with his functioning and cause him significant distress," Dr. Barragan requested authorization for additional psychotherapy sessions. (*Id.*)

In May 2012, to Dr. Donald Golden, Plaintiff reported having nightmares and an inability to sleep. (Doc. 9-15 at 48) He believed Plaintiff continued to "suffer[] from persisting abdominal pain, insomnia, and Post-Traumatic Stress Disorder." (Doc. 9-8 at 7) In addition, he opined Plaintiff had a "stressful affect." (Doc. 9-14 at 19) Dr. Golden observed, "Although his condition [was] improving, it ha[d] proven to be a slow process." (Doc. 9-8 at 7) Dr. Golden also opined Plaintiff's "physical and emotional symptoms continue[d] to interfere with his daily functioning." (*Id.*)

On June 18, 2012, Dr. Golden noted that Plaintiff was "still having problems [with] stress [and] sleep." (Doc. 9-14 at 25) Two days later, Dr. Barragan also observed that Plaintiff was in a "precarious emotional state." (*Id.* at 28) He opined Plaintiff "deteriorated emotionally after his financial assistance ended and he was evicted from his apartment…." (*Id.*) According to Dr. Barragan, the situation "brought [Plaintiff] more stress and surpassed his already diminished coping resources." (*Id.*) Dr. Barragan determined that Plaintiff's level of "emotional distress [was] clearly depicted by his recent BDI-II score of 33, which falls in the 'Severe' range of depressive symptoms." (*Id.*)

On June 27, 2012, Plaintiff reported he was staying at a "ministry," where the tenants were

"partially[2] violent." (Doc. 9-15 at 53)  The following week, Plaintiff said he was "doing better" while living with the "ministry program." (*Id.* at 54)  Dr. Golden opined Plaintiff's "PTSD [was] slowly improving." (*Id.*)

Dr. Tawnya Brode reviewed Plaintiff's file and completed a mental residual functional capacity assessment on September 5, 2012. (Doc. 9-4 at 5-10)  Dr. Brode noted Plaintiff complained of "anxiety, nightmares, somatic issues," paranoia, and having flashbacks. (*Id.* at 7)  She opined, "In review of [the] file, it appears [his] allegation of PTSD/anxiety is moderate, depression is mild." (*Id.*)  In addition, she opined Plaintiff was benefiting from Lexapro. (*Id.*)  Dr. Brode believed Plaintiff's ability to understand, remember and carry out very short and simple instructions was "[n]ot significantly limited." (*Id.* at 8-9)  She determined Plaintiff had moderate limitations with detailed instructions, and with maintaining attention and concentration. (*Id.* at 9)  According to Dr. Brode, Plaintiff was "[a]ble to maintain adequate attention and concentration… and to sustain a workday/ workweek schedule." (*Id.*)  She indicated Plaintiff had moderate limitations with interacting with the general public, but was "[a]ble to interact with others in a superficial manner." (*Id.* at 9-10)  Dr. Brode concluded Plaintiff was "capable of simple work." (*Id.* at 7)

In October and November 2012, Dr. Golden opined Plaintiff continued to have "Acute PTSD" and "chronic pain" secondary to his gunshot wound. (Doc. 9-17 at 3, 6)

In December 2012, Dr. Barragan completed a psychological treatment update in which he indicated Plaintiff had six therapy sessions over the course of the past six months, and was "benefitting from his involvement in psychotherapy." (Doc. 9-17 at 12-13)  Dr. Barragan noted Plaintiff reported he was "feeling 40% less irritable," "happier and more optimistic," and was "more assertive and open about his feelings." (*Id.* at 13)  Plaintiff also said that his nightmares and flashbacks decreased in frequency, and he was "sleeping more hours." (*Id.*)  Dr. Barragan indicated that Plaintiff's emotional symptoms included: suicidal ideation, depressed affect, low self-esteem, pessimism, inappropriate guilt, poor concentration, restlessness, indecisiveness, hypervigilance, and "[d]iminished interest in activities that bring pleasure." (*Id.*)  In addition, he observed that Plaintiff had "[i]ntense physical and

---

[2] This word is somewhat illegible and may be, in fact, "potentially" or "periodically."

8

psychological distress when exposed to reminders of his traumatic industrial injury." (*Id.*) Dr. Golden continued to opine Plaintiff had "Acute PTSD." (*Id.* at 18)

Dr. Harvey Alpern completed an Agreed Medical Evaluation on January 21, 2013. (Doc. 9-17 at 29) Plaintiff reported that he took at least three Vicodin a day, as well as Tramadol. (*Id.* at 31) According to Dr. Alpern, Plaintiff "gave various stories about the location of [his] pain [and] the type of pain" during the examination, indicating he had "vague, occasional, persistent, aching in various parts of the abdomen." (*Id.*) Plaintiff told Dr. Alpern that he lived in a church home and attended church." (*Id.* at 31-33) He did "not think he [could] do the work that he previously did because he [was] afraid of people." (*Id.* at 33) Dr. Alpern opined Plaintiff had "a pain syndrome and… [was] taking an inordinate amount of opiates." (*Id.* at 57) In addition, Dr. Alpern concluded Plaintiff had "obvious severe anxiety issues with perhaps agoraphobia which evidently [were] being addressed, but unfortunately [was] still quite symptomatic." (*Id.*) In a supplemental report, Dr. Alpern noted imaging showed Plaintiff had "bullet fragments in the abdomen." (*Id.* at 81)

In April 2013, Dr. Barragan completed a psychological treatment update, noting he had not seen Plaintiff since January. (Doc. 9-17 at 77) He indicated that Plaintiff had been "unable to keep his appointments due to a lack of financial resources." (*Id.*) Dr. Barragan opined Plaintiff's "PTSD and depressive symptoms [would] likely escalate" without additional treatment. (*Id.* at 78)

Dr. Golden observed that Plaintiff's PTSD was "of moderate intensity" in May and June 2013. (Doc. 9-17 at 84) Plaintiff told Dr. Golden "the frequency of his symptom[s] [was] several times a week," and aggravating factors included emotional distress. (*Id.*) Plaintiff reported his symptoms—including headaches and anxiety—were "relieved with medication." (*Id.* at 86) Dr. Golden continued to indicate Plaintiff was "[u]nable to return to work." (*See id.* at 85, 87)

In July 2013, Dr. Barragan opined that Plaintiff was "greatly benefiting from his involvement in psychotherapy" "despite being homeless for a time." (Doc. 9-17 at 94) Plaintiff reported he was taking less pain medication and felt "calmer and more optimistic," as well as "less irritable and isolated." (*Id.*) Dr. Barragan believed Plaintiff was in a "fragile and unstable emotional state" because he had recently reported having suicidal thoughts and was "experiencing extreme levels of stress[] in his life." (*Id.*)

On August 6, 2013, Dr. Eric Morgenthaler administered the Millon Clinical Multiaxial

Inventory-III (MCMI-III), Beck Depression Inventory, Beck Anxiety Inventory, and Symptom Checklist-90-Revised (SCL-90-R). (Doc. 9-18 at 9, 41-43) With the MCMI-III, Dr. Morgenthaler determined Plaintiff was "unhappy and anxious" and "prone toward anxious worry and obsessive rumination." (*Id.* at 41) In addition the results indicated Plaintiff was "[i]nterpersonally … timid, fearful;" "easily slighted;" "avoidant of conflict;" and "prone toward chronic depression." (*Id.*) Due to Plaintiff's endorsement of 88 out of 90 symptoms on the SCL-9-R, Dr. Larsen opined the score indicated "symptom exaggeration." (*Id.* at 42) Plaintiff's scores on both the Beck Depression Inventory and Beck Anxiety Inventory fell within the "severe" range. (*Id.*) Dr. Morgenthaler concluded the psychological data indicated Plaintiff was "presenting himself as a severely anxious, depressed, physically ill and possibly psychotic individual." (*Id.* at 43) Due to the "signs of possibly symptom exaggeration," Dr. Morgenthaler believed Plaintiff's "subjective complaints [would] need to be carefully validated by direct clinical observations and history." (*Id.*)

Dr. Robert Larsen performed an agreed psychiatric evaluation related to Plaintiff's workers' compensation claims on August 8, 2013. (Doc. 9-17 at 106) Dr. Larsen noted that Plaintiff reported he was "living in a rehabilitation home" and volunteered at the home and through an evangelical church. (Doc. 9-18 at 3) Plaintiff said he avoided crowds and was "sensitive to situations where he thinks he is being watched" because he felt like people were following him. (*Id.*) Dr. Larsen observed:

> He was alert and fully oriented to time, place and person. His speech was clear and well metered without indication of psychomotor retardation or pressured speech. His behavior was cooperative in the course of the interview. He was most emotive while discussing the robbery incident. His intelligence was grossly within normal limits. His attention and comprehension were intact as he responded directly to questioning. There was no indication of a gross memory deficit. There was no evidence of a disturbance of thought such as a delusion or paranoid ideation. Suicidal and homicidal ideation were not evident.

(Doc. 9-18 at 6) Dr. Larsen diagnosed Plaintiff with post-traumatic stress disorder and "a chronic minor depression or dysthymic disorder." (*Id.* at 13) He noted Plaintiff's symptoms were "moderate" and gave him a GAF score of 55.[3] (*Id.*) Dr. Larsen believed Plaintiff's "psychiatric presentation should be viewed a having reached a permanent and stationary status and… probably [had] been so for quite

---

[3] A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *DSM-IV* at 34.

some time." (*Id.* at 15)  According to Dr. Larsen, "Some fluctuation in symptoms is expected… One could take the position that at the point that Dr. Barragan documented his patient's involvement in taking classes, attending church and going to the gym in a report from December 2011 maximum medical improvement had been achieved." (*Id.*)  Dr. Larsen recommended Plaintiff continue therapy sessions with Dr. Barragan and taking an antidepressant.  (*Id.* at 17)

On October 31, 2013, Dr. P.M. Balson reviewed Plaintiff's file, and opined Plaintiff had mild difficulties with activities of daily living' moderate difficulties maintaining social functioning; and moderate difficulties with maintaining concentration, persistence or pace.  (Doc. 9-4 at 20)  Dr. Balson also concluded Plaintiff could perform "simple work" affirmed the findings of Dr. Brode.  (*Id.*)

Dr. Barragan completed a treatment update on November 14, 2013.  (Doc. 9-20 at 78)  He believed Plaintiff "continue[d] to benefit from his involvement in psychotherapy."  (*Id.*) Plaintiff told Dr. Barragan that he was "feeling calmer and happier" and was "taking less pain medication."  (*Id.*) Later that month, Plaintiff told Dr. Golden that his "anxiety [was] controlled with medication."  (*Id.* at 2)  Dr. Golden continued to opine Plaintiff's PTSD was "of moderate intensity."  (*Id.*)

Plaintiff was last insured on December 31, 2013 (Doc. 18-3 at 7), after which he continued to be treated "[a]pproximately every 3 weeks" by Dr. Barragan.  (Doc. 9-21 at 12; *see also* Doc. 9-20 at 59-77)

On July 9, 2015, Dr. Barragan completed a mental residual functional capacity questionnaire. (Doc. 9-21 at 12)  Dr. Barragan opined Plaintiff would be unable to understand, remember, and carry out very short and simple instructions "for more 15% or more of an 8-hour workday."  (*Id.* at 12-13) Dr. Barragan indicated that for 15% or more of a workday, Plaintiff would be precluded from maintaining attention and concentration, performing activities within a schedule, maintaining regular attendance, and being punctual.  (*Id.* at 13)  Dr. Barragan also opined Plaintiff would have difficulty working in coordination with or in proximity to others without being distracted, interacting appropriately with the public, accepting instructions and responding to criticisms from supervisors, and maintaining social appropriate behavior for 15% or more of the an 8-hour day.  (*Id.*)  He believed Plaintiff was likely to be absent from work 5 days or more each month as a result of his impairments. (*Id.* at 14)  Dr. Barragan indicated he based these opinions upon Plaintiff's history, medical file,

psychological evaluations, and the QME reports.  (*Id.*)

**B.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity between his alleged onset date of April 17, 2009 and his date last insured of December 31, 2013.  (Doc. 18-3 at 7)  At step two, the ALJ found Plaintiff "had the following severe impairments: status post gunshot [wound] with right iliac crest fracture, atrial fibrillation, post-traumatic stress disorder (PTSD), and depressive disorder." (*Id.*)  At step three, the ALJ determined these impairments did not meet or medically equal a Listing.  (*Id.* at 7-9)  Next, the ALJ found:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform a range of medium work.  He could lift and carry up to 50 pounds occasionally and 25 pounds frequently.  He was able to sit, stand, and/or walk six to eight hours over the course of an eight-hour workday.  Mentally, he could perform simple, routine tasks. He could tolerate occasional public contact (20 CFR 404.1567(c)).

(*Id.* at 9)  Based upon this RFC, the ALJ concluded Plaintiff "was capable of performing past relevant work as a salvage laborer."  (*Id.* at 14)  Thus, the ALJ concluded Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from April 17, 2009, the alleged onset date, through December 31, 2013, the date last insured."  (*Id.* at 16)

<u>**DISCUSSION AND ANALYSIS**</u>

**A.     The ALJ's Evaluation of the Medical Record**

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A treating physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and

convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830.

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Here, Plaintiff contends the ALJ erred in rejecting the limitations identified by Dr. Barragan, which conflicted with the opinions of Drs. Brode and Balson. Given the conflicting opinions, the ALJ was required to set forth specific and legitimate reasons to support her rejection of Dr. Barragan's opinions. *See Lester*, 81 F.3d at 830.

The ALJ explained the weight she gave to the opinions of Dr. Barragan as follows:

> I give minimal weight to the form that Jorge Barragan, Psy.D. completed in July 2015 (Exhibit 13F). The extreme limitations that Dr. Barragan identified are inconsistent with his own records of treating the claimant. Dr. Barragan's treatment summaries consistently indicate that the claimant's symptoms responded positively to psychotherapy. (Exhibit 1F; 3F, p. 274-277, 288-289, 301-302, 322-323, 381-833, 395-396, 442-443, p. 89-92, 154-155, 170-172; 10F).

(Doc. 18-3 at 13) In addition, the ALJ indicated she gave "significant weight" to the opinion of Drs. Brode and Balson, finding they were "consistent with the record of mental health treatment, as well as the claimant's complaints of residual depression, irritability, and hypervigilance." (*Id.* at 13)

### 1. Treatment notes

The Ninth Circuit determined an opinion may be rejected where there are inconsistencies within a physician's reports. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999). However, it is an error to read a treating physician's notes "selective[ly]" rather than "in full and in context." *Holohan v. Massanari*, 246 F.3d 1195, 1204-05 (9th Cir. 2001). The Ninth Circuit determined also that an ALJ cannot properly reject a treating physician's opinion as being "inconsistent" with his or her treatment notes if the "inconsistency" is only, for instance, that the claimant showed improvement during treatment. *Id.*

In *Holohan*, the ALJ rejected the treating physician's opinion that the claimant suffered from "marked" impairments with respect to "performance of any work activity due to anxiety/panic attacks and poor concentration." *Holohan*, 246 F.3d at 1204-05. The ALJ rejected the opinion as "totally inconsistent with [the physician's] own treatment notes and records . . ." *Id.* The ALJ stated the treatment notes "indicate[d] control of panic attacks" with medication; a "great improvement" in the claimant's condition; and the physician's finding that the panic attacks increased with inactivity, such that she was happy when she joined the YMCA. *Id.* Upon appeal, the Ninth Circuit found the ALJ erred in rejecting the treating physician's opinion on these grounds. *Id.* The Court found the ALJ was too "selective" in his reliance on the treating physician's notes, and "exaggerate[d]" the contents. *Id.* at 1205. The Court's review of the record confirmed that, while the treatment notes revealed the claimant was "doing better," her panic attacks were only "15% better." *Id.* Similarly, the physician never identified a "great improvement" in the claimant's condition. *Id.* The Court concluded the physician's notes "must be read in context of the overall diagnostic picture he draws," and "some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Id.*; *see also Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1201 (9th Cir. 2008) (citing *Holohan* and holding treatment notes reflecting a patient's "improvement" did not undermine the physician's repeated conclusions and diagnosis).

Likewise, here it appears the ALJ engaged in a selective reading of the treatment notes. Broadly citing each of the updates prepared by Dr. Barragan, the ALJ observed that the "treatment summaries consistently indicate that the claimant's symptoms responded positively to psychotherapy." (Doc. 18-3 at 13) However, the ALJ fails to address any of the findings of Dr. Barragan regarding "emotional decompensation" or declining affective functioning over the course of treatment. For example, in July 2010, Dr. Barragan determined that Plaintiff "had responded favorably to psychological intervention, but his affective functioning declined." (Doc. 9-12 at 90) At that time, Dr. Barragan noted Plaintiff's core on the PTSD Checklist was 60, which was increase over the score of 56 in November 2009. (*See id.* at 57, 91) In addition, Dr. Barragan opined Plaintiff's "affective state declined" over the summer of 2011, and " scores on the BDI-II (32) and PCLC (64) corroborated [his] observations and his affirmations." (Doc. 9-13 at 52-53) Again in June 2012, Dr. Barragan believed that Plaintiff was in a

"precarious emotional state," and his level of "emotional distress [was] clearly depicted by his recent BDI-II score of 33, which falls in the 'Severe' range of depressive symptoms." (Doc. 9-14 at 28) Though Dr. Barragan repeatedly discussed the findings on the BDI-II and PTSD Checklist (PCLC), these findings were not addressed by the ALJ.

Moreover, the fact that Plaintiff's symptoms improved as the physicians prescribed more medication he engaged in more therapy sessions—leading Dr. Barragan to opine Plaintiff's affective condition was stable in 2012 (Doc. 9-8 at 3)—does not undermine the findings of Dr. Barragan. *See e.g., Richardson v. Astrue*, 2011 U.S. Dist. LEXIS 132843 at *18-19, 172 Soc. Sec. Rep. Service 69 (C.D. Cal. Nov. 17, 2011) (observing the treatment notes indicated the plaintiff's condition was "stable," yet she had "an active disease which require[d] aggressive medications" and finding the ALJ erred by "improperly equat[ing] stability with functionality"); *Lule v. Berryhill*, 2017 U.S. Dist. LEXIS 19392, at *18 (E.D. Cal. Feb. 9, 2017) (finding the ALJ erred in evaluating the record because the stability of a condition alone does not support a conclusion that the claimant is "able to perform work for an eight-hour day").

Because the ALJ engaged in a selective review of the treatment notes and fails to identify specific inconsistencies between the treatment notes and limitations identified by Dr. Barragan, and the treatment notes do not support the ALJ's decision to reject the limitations.

### 2. Consistency with the medical record

The Ninth Circuit determined an ALJ may reject limitations "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). However, when an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts *and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). For example, an ALJ may also discount the opinion of a treating

physician by identifying an examining physician's findings to the contrary and identifying the evidence that supports that finding. *See, e.g., Creech v. Colvin*, 612 F. App'x 480, 481 (9th Cir. 2015).

The ALJ adopted the findings of Drs. Brode and Balson, finding the opinions were "consistent with the record of mental health treatment." (Doc. 18-3 at 13) In doing so, the ALJ implicitly rejected the opinions of Dr. Barragan as inconsistent with the record. However, the ALJ fails to identify any specific findings in the record regarding Plaintiff's mental abilities that contradicted the limitations identified by Dr. Barragan. For example, the ALJ does not identify any objective evidence that Plaintiff would not be precluded from maintaining attention and concentration, performing activities within a schedule, maintaining regular attendance, and being punctual for more than 15 percent of the workday, or that he was unlikely to be absent from work five or more days a month.

Rather than identify evidence that conflicted with the limitations identified by Dr. Barragan, the ALJ offered only a summary of the record and her conclusion that the record did not support the mental limitations identified.[4] However, this conclusion "does not achieve the level of specificity [that] prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). Because the ALJ failed to identify specific evidence that conflicted with the limitations identified by Dr. Barragan, the ALJ erred in evaluating the medical record and rejecting the opinion of Plaintiff's treating physician.

**B. Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence,
> (2) there are no outstanding issues that must be resolved before a determination of

---

[4] Importantly, the Court is "constrained to *review* the reasons the ALJ asserts." *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (emphasis in original) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)); *Bray v. Comm'r*, 554 F.3d 1219, 1229 (9th Cir. 2009) (the Court cannot engage in "post hoc rationalizations that attempt to intuit what the [ALJ] might have been thinking"). Although Defendant identifies inconsistencies between the opinions of Dr. Barragan with the record and the report of Dr. Larsen, these inconsistencies were not discussed by the ALJ and cannot support the decision. *See Brown-Hunter*, 806 F.3d at 494; *Bray*, 554 F.3d at 1229

disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the ALJ failed to identify legally sufficient reasons for rejecting the mental limitations assessed by Dr. Barragan. Because the ALJ failed to resolve the conflicts in the medical record regarding Plaintiff's mental limitations and engaged in a selective reading of the treatment notes, the matter should be remanded for further proceedings, and for the ALJ to re-evaluate the medical evidence. *See Moisa*, 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in her evaluation of the medical record, and the Court should not uphold the administrative decision. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on these grounds, it offers no opinion on the remaining argument presented in Plaintiff's opening brief. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Andres R. Espinoza Zavala and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: __February 1, 2019__          _____/s/ Jennifer L. Thurston__
                                        UNITED STATES MAGISTRATE JUDGE

17